WILMINGTON TRUST COMPANY, a corporation of the State of Delaware, Trustee under Items, or Paragraphs 10, 11, and 12 of the Last Will and Testament of Joseph Bancroft, Deceased,

*vs.*

THE WILMINGTON SOCIETY OF THE FINE ARTS, a corporation of the State of Delaware, and SAMUEL B. BIRD.

*New Castle, October 30th, 1943.*

*Charles F. Richards,* for complainant.

*Robert H. Richards* and *Aaron Finger,* of the firm of Richards, Layton & Finger, for Samuel B. Bird.

*Hugh M. Morris, Edwin D. Steel, Jr.,* and *S. Samuel Arsht,* of the firm of Morris, Steel and Nichols, for The Wilmington Society of the Fine Arts.

HARRINGTON, Chancellor: By Item 10 of his last will and testament, Joseph Bancroft devised and bequeathed all of the rest, residue and remainder of his estate and property

to the Wilmington Trust Company, a corporation of the State of Delaware, the complainant, in trust, to pay the net income therefrom to his wife, Elizabeth H. Bancroft, for and during the term of her natural life. In the same Item he also provided:

"Upon the death of my said wife, in further trust, to transfer and convey unto my nephew, Samuel B. Bird, if he is then living, all the stock which I may own in Joseph Bancroft and Sons Company, a corporation existing under the laws of the State of Delaware. In further trust, upon the death of my said wife, all the rest, residue and remainder of said trust property and estate, to assign, transfer and convey unto Wilmington Society of Fine Arts, a corporation existing under the laws of the State of Delaware, to use to establish and maintain a suitable memorial in memory of my father and mother."

In Item 12, the testator authorized and empowered his trustee, in its discretion,

"* * * to sell or dispose of any real or personal property forming a part of the said trust, either at public or private sale * * * the proceeds received from such sale or sales to be held subject to the trusts aforesaid; provided, however, that the said trustee shall not sell or dispose of my stock in the Joseph Bancroft and Sons Company without the consent of my nephew, the said Samuel B. Bird, and if such stock shall be so sold, the proceeds received therefrom shall upon the death of my said wife be paid unto my said nephew."

The intended scope of the bequest to Samuel B. Bird in Item 10 is the important question. At the death of Joseph Bancroft, on May 6th, 1936, his estate consisted of numerous corporate stocks and bonds, bank accounts, notes and various other assets, all of which had a net value in excess of $850,000. Among them were 300 shares of preferred stock and 5000 shares of common stock of the "Joseph Bancroft and Sons Company", a corporation of the State of Delaware, and 4 shares of the capital stock of the "Estate of Samuel Bancroft, Jr., Incorporated", likewise a corporation of this State. All of these shares stood in the name of Joseph Bancroft on the corporate records. As a legatee under the will of his mother, Mary R. Bancroft, who had died December 4th, 1933, he was also entitled to a propor-

tionate part of her estate, though it had not been settled at the time of his death. Some time thereafter, her surviving executrix assigned and transferred to the executors of Joseph Bancroft, as a part of his said legacy, 859 shares of the preferred stock of the Bancroft Company, 100 shares of its common stock and two shares of the Estate Corporation. The acquisition of the latter shares made his estate a one-half owner of all of the stock issued by the Estate Corporation. Upon the settlement of the estate of Joseph Bancroft, his executors delivered to the complainant, as trustee: (1) The 300 shares of preferred stock and the 5000 shares of common stock of the Bancroft Company, of which he was the legal owner at the time of his death; (2) the 859 shares of preferred stock and 100 shares of common stock of that company, acquired from the estate of his mother, Mary R. Bancroft, deceased; and (3) the 2 shares of stock of the Estate Corporation, which had also been acquired from the same source.

Pursuant to the direction of the will of Mary R. Bancroft, the two remaining shares of the Estate Corporation, owned by her, were transferred to the Wilmington Trust Company and Daniel M. Bates, Trustees for the benefit of her daughter, Elizabeth R. B. Bird, during her lifetime.

The Bancroft Estate Corporation was dissolved by the appropriate action of its directors and stockholders July 1st, 1940, and one-half of its assets were assigned and transferred in kind to the complainant, as trustee of the residue of Joseph Bancroft's estate. The Wilmington Trust Company, as trustee, therefore acquired from that source 886 shares of preferred stock and 11,650 shares of common stock of the "Joseph Bancroft and Sons Company".

Elizabeth H. Bancroft, the wife of Joseph Bancroft, died October 28th, 1941, or a little more than a year after that stock had been acquired by the trustee. Samuel B. Bird survived her, and the trustee subsequently assigned

and transferred to him all of the stock in the "Joseph Bancroft and Sons Company", which had stood in the name of Joseph Bancroft at the time of his death, and all of the stock in the same company, the legal title to which was subsequently acquired from the executors of his mother, Mary R. Bancroft. The validity of these assignments is not denied; but Samuel B. Bird claims that he is, also, entitled to the shares of the Bancroft Company acquired on the dissolution of the Bancroft Estate Corporation, and so avers in his answer. On the other hand, the Wilmington Fine Arts Society denies his right to that stock, and claims that it composes a part of the legacy bequeathed to it under the will of Joseph Bancroft.

Shortly after the death of Elizabeth H. Bancroft, with the consent of the defendants, and without prejudice to the rights of either of them, the complainant trustee sold 665 of the 886 shares of preferred stock, acquired on the dissolution of the Estate Corporation, for $75 per share, and realized therefrom the net sum of $45,769.56. When the amended bill was filed, the trustee still held for distribution, pursuant to the direction of this court, the remaining 221 shares of preferred stock and the 11,650 shares of common stock of the "Joseph Bancroft and Sons Company", acquired from the same source. All of these facts appear from the pleadings. On a subsequent date, with the consent of the defendants, and, also, without prejudice to the rights of either of them, the remaining 221 shares of the preferred stock of the "Joseph Bancroft and Sons Company", acquired on the dissolution of the Estate Corporation, were, also, sold for $75.00 per share, and the net sum of $16,561.74 was realized therefrom. The trustee, therefore, holds for distribution, pursuant to the direction of this court, $62,331.30 in cash and 11,650 shares of the common stock of the Bancroft Company.

The following evidence was also produced at the hearing. Samuel Bancroft, Jr., the testator's father, died in

1916, leaving a net estate of upwards of $2,000,000, which passed to his widow, Mary R. Bancroft, and two children, Joseph Bancroft and Elizabeth R. B. Bird. Shortly thereafter, they organized a corporation, known as "Estate of Samuel Bancroft, Jr., Incorporated", to take over, hold, manage and dispose of all of the property late of Samuel Bancroft, Jr., both real and personal; and no other assets ever came into its possession except on the reinvestment of funds arising from the sale of property or securities. That corporation had an authorized single stock issue of 3,000 shares of the par value of $100 per share, but only 12 shares were ever issued: 4 to Joseph Bancroft, 4 to Elizabeth R. B. Bird, and 4 to Mary R. Bancroft. The minutes of the first meeting of the board of directors, held March 16th, 1916, indicate that the corporation was to acquire all of the property late of Samuel Bancroft, Jr., deceased, for $300,000; of this sum, $298,800 was to be paid to the Bancroft family in stock and $1200 in cash. The reasonable inference is that the latter sum was to be paid into the corporate treasury by the original subscribers for stock; but, while there is some conflict, the evidence indicates that that sum was never actually paid. Moreover, as already indicated, no stock, other than the twelve shares originally subscribed for, was ever issued to the Bancroft family; nor was the $1200 ever paid to them.

The testator had no children. He took great pride in the Bancroft Company, and, for a considerable time prior to his death, had planned to secure control of it, with the idea that his nephew, Samuel B. Bird, might ultimately have a position of importance in its management. To that end, he had from time to time started negotiations with English and other relatives for the purchase of their material stockholdings. He was the president and one of the directors of the Estate Corporation from the time of its organization, and, until his death, dominated and controlled its management, as though he were the sole owner. His mother, prior

to her death, and his sister were the other members of that board. Between 1926 and Joseph Bancroft's death, he had purchased numerous shares of stock in the Bancroft Company, but had sold none. During the same period he had caused the Estate Corporation to purchase numerous shares of the same stock, and likewise it had sold none. That corporation, at the time of his death, was the legal owner of 1772 shares of preferred and 23,300 shares of common stock of the Joseph Bancroft and Sons Company.

The testator had contemplated a dissolution of the Estate Corporation and a distribution of its assets since 1927 or 1928, but, as it held a considerable amount of real estate, he wished to sell it, and to invest the proceeds before taking that step; he preferred to distribute securities to the parties entitled rather than real property or cash.

The will of Joseph Bancroft disposed of a considerable estate, and, though he was not a lawyer, he drafted it himself. He handed the manuscript to his attorney merely to be typed, and in order that the latter might supervise its execution. The attorney supplied the correct names of some of the corporations mentioned therein, but made no other changes, and was expected to make none. The will was drawn and executed in 1931, and early in 1934 he stated to an official of the company: "Some day Sam (meaning Samuel B. Bird) will have all the interest of my father's side of the family in the Bancroft Company." Most of this evidence was offered on behalf of Samuel B. Bird over the objection of the solicitor for The Wilmington Society of the Fine Arts, and subject to his motion to strike it out on the ground that it was wholly immaterial.

In Item 10, the testator provides that "upon the death of" his wife, the life beneficiary of his estate, "all the stock which I may own in Joseph Bancroft and Sons Company, a corporation existing under the laws of the State of Delaware," shall be transferred and conveyed to his nephew,

Samuel B. Bird, "if he is then living." On its face, Item 12 is equally specific. It authorizes the trustee to sell any real or personal property belonging to the trust estate, but inserts a proviso that it "shall not sell * * * my stock in the Joseph Bancroft and Sons Company without the consent of my nephew, the said Samuel B. Bird."

It is not denied that an equitable interest in any property will pass under a will if that is the testator's intent. 1 *Page on Wills* (*L.T.Ed.*) §§ 196, 262. In a general and liberal sense, statements are sometimes made that the shareholders of a corporation are the real equitable owners of any property held by it (*State v. Loft, Inc.*, 4 *W. W. Harr.* (34 *Del.*) 538, 156 A. 170; *Bogert on Trusts and Trustees*, § 16, *p.* 54) ; but that statement is not strictly correct. *Ballantine on Corp.*, 21; 1 *Fletcher Cyc. Corp.* (Per. Ed.) 25; 1 *Bogert on Trust and Trustees*, § 16, *p.* 55; *People v. Dennett*, 276 *Ill.* 43, 114 *N.E.* 493. Until legally dissolved, a corporation is the absolute owner of all of its property. *Id.* Moreover, Joseph Bancroft had no other real equitable rights in the family property after its assignment and transfer to the Estate Corporation, nearly seventeen years before his death. No resulting trust vested in him; nor did the corporation have title, as a mere administrative agency of the Bancroft family that could be terminated by them at will. The acceptance of stock issued by that corporation gave them rights which seem to rebut that contention, and no creditors' rights were involved. The facts show that a gift was not intended, and apparently the contemplated consideration was never fully paid; but that seems unimportant as all of the stock issued was to the assignors of the property late óf Samuel Bancroft, Jr., deceased, and in proportion to their respective interests therein. This must have been with their consent, as they absolutely controlled that corporation. They were not only its sole stockholders, but were also its directors. Neither *Freeman v. Tatham*, 5 *Hare* 329, nor *United States v. Brager Building and Land*

*Corporation,* (4 *Cir.*) 124 *F.* 2d 349, is inconsistent with this conclusion. The former involves a resulting trust, growing out of the transfer of property to an individual without any consideration whatever when a gift was not intended. The latter holds that a corporate entity, created for the convenient administration of partnership property, was a mere administrative agency; but it involves Federal tax questions, and, therefore, the rights of a third person.

It is contended, however, that whatever the real strict nature of Joseph Bancroft's rights may have been in stock, held by the Estate Corporation at his death, the extrinsic evidence admitted shows that the meaning of the phrase "all of the stock which I may own" in the Bancroft Company was ambiguous and uncertain. Furthermore, it is contended that when that evidence is read with the language of the will, it shows that the phrase in controversy was used in a broad and comprehensive sense, and was intended to include a one-half interest in all the Bancroft Company stock, then held by the Estate Corporation. I am unable to agree with either of these contentions.

In construing a will, it cannot be denied that the intent of the testator is the important question to be determined, and in its final analysis that necessarily depends on the language used, when the instrument is read as a whole. *Maloney v. Johnson,* 24 *Del. Ch.* 77, 5 *A.* 2d 660; *Hall v. Crandall,* 25 Del. Ch. 339, 20 *A.* 2d 545. Moreover, words and phrases in common use are ordinarily given their usual meaning unless the context indicates that some other meaning is intended [1 *Page on Wills,* (2d *Ed.*) 1402; *Hall v. Crandall, supra;* see also *Colvocoresses v. W. S. Wasserman Co.,* 9 *W. W. Harr.* (39 *Del.*) 71, 196 *A.* 181]; but in cases of real doubt, pertinent surrounding facts and circumstances are frequently important to aid the court in determining the testator's intended meaning. *Maloney v. Johnson, supra; Hall v. Crandall, supra.* Such extrinsic evidence is merely admitted, however, for explanatory purposes; it

is "to resolve what is uncertain, but not to change or contradict what is plain, nor to substitute or insert new matter." *Maloney. v. Johnson, supra; Page on Wills,* (L.T.Ed.) § 631. Usually, its object is to put the court, as nearly as possible, in the position of the testator at the time he executed his will. *Maloney v. Johnson, supra; Hall v. Crandall, supra; Equitable Trust Co. v. Causey,* 24 Del. Ch. 259, 9 A. 2d 714. Even if the language of a will seems to be plain and unambiguous on its face, some extrinsic evidence is always admissible to identify the property disposed of thereby. *Knight v. Knight,* 5 Boyce 570, 96 A. 32; *Sussex Trust Co. v. Polite,* 12 Del. Ch. 64, 106 A. 54; *Page on Wills,* (L.T.Ed.) § 633; 94 A.L.R. 52. But the scope of such identifying evidence depends on the circumstances; if no ambiguity or uncertainty in the meaning of the words and phrases used is disclosed, little evidence may be sufficient to apply the language of the will to the property intended. *Darden v. Bright,* 173 Md. 563, 198 A. 431, *Page on Wills,* (L.T.Ed.) §§ 632, 634, 673. If, however, some ambiguity is disclosed, such as in a general, descriptive term used, other facts relating to the testator's family, the nature and character of his property, and other known material explanatory circumstances existing at the time of the execution of his will, may usually be admitted and considered by the court to aid in identifying the property intended to pass to a particular legatee. *Knight v. Knight, supra; Sussex Trust Co. v. Polite, supra; Equitable Trust Co. v. Causey, supra.* Moreover, if the subject of the bequest is of such a nature that the testator may have intended subsequent additions to, or even substitutions for it to pass under the language of the will, that instrument may be construed to speak as of his death rather than as of the time of its execution. *Sussex Trust Co. v. Polite, supra; Page on Wills,* (L.T.Ed.) § 656. Applying that rule, it has been held that acts or declarations, subsequent to the execution of a will, relating to the testator's purpose in acquiring certain property and the nature of its use by him, are material circum-

stances which aid in determining what property passed to the devisee. *Sussex Trust Co. v. Polite, supra;* see also *Spinney, Ex'r, v. Eaton, et al.,* 111 *Me.* 1, 87 *A.* 378, 46 *L.R.A.* (*N.S.*) 535. It is conceded, however, that while pertinent circumstances are admissible to show intent, express declarations of the testator that he intended the words and phrases used to have a stated meaning are not admissible in cases of this nature. *Equitable Trust Co. v. Causey, supra; Sussex Trust Co. v. Polite, supra; Thompson on Wills,* (2d Ed.) 326. The question is not what the testator meant to say, but what he did say. We must also bear in mind that, when explicit, the words of an instrument usually have a greater probative value than can be safely drawn by inference from surroundings. The line of exclusion in construing both contracts and wills, therefore, "depends on how far the words used will stretch, and how alien is the intent they are asked to include." See *Colvocoresses v. Wasserman Co.,* 9 *W. W. Harr.* (39 *Del.* 71) 196 *A.* 181.

It appears from the pleadings that at Joseph Bancroft's death, he was the legal owner and also the equitable owner of a considerable amount of stock in the Bancroft Company.

The evidence offered on behalf of Samuel B. Bird to show ambiguity and identity, and tentatively admitted, was substantially, as follows:

(1)   That, though Joseph Bancroft was not a lawyer, he drafted his own will;

(2)   Facts relating to the creation, purpose and management of the Bancroft Estate Corporation; Joseph Bancroft's interest in the property transferred to it; the acquisition by that corporation, from time to time, at his instance, since about 1928 or 1929, of Bancroft Company stock, none of which was ever sold; his material stock interests in the Estate Corporation since its organization, and his greater interests at the time of his death;

(3)   That Joseph Bancroft, individually had likewise

purchased Bancroft Company stock from time to time since 1926, but had sold none;

(4) That Joseph Bancroft had great pride in the Bancroft Company; that he had no children, but had one nephew, Samuel B. Bird; that the latter was employed by the Bancroft Company, and that his uncle was definitely interested in his continued connection with and advancement in that company;

(5) The testimony of an officer of the Bancroft Company that Joseph Bancroft had stated to him in 1934, and, therefore, some three years after the execution of his will, that "some day Sam (meaning Samuel B. Bird) will have all the interest of my father's side of the family" in the Bancroft Company;

(6) Bird's testimony: (a) That Joseph Bancroft had discussed with him from time to time his plans for eventually acquiring a controlling stock interest in the Bancroft Company, and its ultimate control by Bird; (b) that Joseph Bancroft had, also, stated on repeated occasions that he desired to hold intact all of the Bancroft Company stock which had been held by his father, Samuel Bancroft, Jr., deceased, and by the latter's family; and (c) that Joseph Bancroft had contemplated a dissolution of the Estate Corporation and a distribution of its assets in kind to the parties entitled long before his death.

The extrinsic facts appearing in the pleadings are sufficient to identify the stock in the Bancroft Company, whether legally or equitably owned by the testator, and bequeathed to Bird. No real ambiguity in the language of the bequest satisfactorily appears, either from the declarations of the testator, or otherwise, and the words used must, therefore, be given their ordinary meaning. The use of the words "my stock" in Item 12 tends to corroborate that conclusion. Substantially all of the evidence, tentatively admitted at the hearing, must, therefore, be disregarded

and stricken out. Proof of ambiguity is essential before additional proof of identity can be admitted or considered. The Estate Corporation was not created for the testator's sole convenience, and he never controlled it by reason of stock ownership. If he largely dictated its management, that could only have been with the consent of the other stockholders and members of the board. He never could have brought about its dissolution and the distribution of its assets in kind. When it was dissolved in July of 1940, or some four years after his death, its directors were Elizabeth R. B. Bird, F. M. Donohue, an officer of the Wilmington Trust Company, elected to succeed Mary R. Bancroft, and Reuben Satterthwaite, Esquire, who was elected to fill the vacancy caused by the death of Joseph Bancroft. Mr. Donohue was the president of that corporation. Moreover, it seems that the Estate Corporation was dissolved because the Wilmington Trust Company, as a controlling stockholder, did not wish to assume the responsibility for the investment of assets in which Mrs. Bird was interested as a minority stockholder. The Trust Company was also affected by the possibility that its interests, as trustee under the will of Joseph Bancroft, might conflict with its interests and those of Daniel M. Bates, as trustees under the will of Mary R. Bancroft, deceased. The court applied a more liberal rule in *Re Bush's Estate*, 124 *Misc.* 674, 209 *N.Y.S.* 776, but different facts were involved.

Either standing alone, or when considered with other evidence, the declaration of the testator in 1934 is of little importance. It may merely tend to show that he had failed to make some intended provision for Bird's benefit; but a court cannot redraft a will. Its powers are confined to its construction as written.

The pleadings show that the Estate Corporation was dissolved prior to the death of the testator's widow, and that its assets, including the stock in the Bancroft Company, were distributed in kind. The complainant, as trustee under

the will of Joseph Bancroft, received his one-half part of that stock; but it does not follow that the testator intended to include it in the bequest to Samuel B. Bird. As we have seen, "upon the death of my said wife," the trustee was directed to "transfer and convey unto * * * Samuel B. Bird, if he is then living, all the stock which I may own in Joseph Bancroft and Sons Company." It is conceded that, in the absence of some provision indicating a contrary intent, a will speaks as of the date of the testator's death. *Harris v. Harris*, 97 *N.J. Eq.* 190, 127 *A.* 108; *Thompson on Wills*, (2d Ed.) § 301. That rule is controlling, as no contrary intent appears. Moreover, Item 12 tends to corroborate that conclusion. It provides that "my stock" in the Bancroft Company shall not be sold by the trustee without the consent of Bird. It then provides that if it "shall be sold", that the proceeds shall be paid to Bird "upon the death of" the testator's wife. Bird claims that by the creation of a prior life estate, the testator indicated an intent that the scope of his bequest was to be determined on the termination of that interest. *Hawke v. Lodge*, 9 *Del. Ch.* 146, 77 *A.* 1090; *Clark v. Hartford-Connecticut Trust Co.*, 127 *Conn.* 101, 14 *A.* 2d 743. But those cases are not pertinent; they merely lay down a general rule of construction for determining whether future interests in certain cases are vested or contingent.

My conclusion, therefore, is that the bequest to Samuel B. Bird did not include any stock in the Bancroft Company, held by the Estate Corporation at Joseph Bancroft's death, and subsequently distributed on its dissolution.

A decree will be entered in accordance with this opinion.

NOTE. On appeal the decree entered in accordance with the foregoing opinion was affirmed by an opinion to be reported in 28 *Del. Ch. Reports*. See 43 *A.* 2d 476.